**UNITED STATES of America, Plaintiff-Appellant,**

v.

**LITTON SYSTEMS, INC., d/b/a Ingalls Nuclear Shipbuilding Division, Defendant-Appellee.**

No. 83–4064.

United States Court of Appeals, Fifth Circuit.

Jan. 13, 1984.

Rehearing and Rehearing En Banc Denied Feb. 7, 1984.

E.L. Brunini, George P. Hewes, III, Charles P. Adams, Jr., Jackson, Miss., Stephen J. Mathes, Bruce W. Kauffman, Philadelphia, Pa., for defendant-appellee.

Before BROWN and RANDALL, Circuit Judges, and HUNTER *, District Judge.

EDWIN F. HUNTER, Jr., District Judge:

This case involves a criminal charge that $37,000,000 claimed for increased costs by Litton's nuclear shipbuilding facility in Pascagoula, Mississippi was fraudulent (18 U.S.C. 287). Litton filed a motion to dismiss the indictment, contending that because of delay and prejudice, further prosecution would violate its Sixth Amendment right to a speedy trial. Litton also urged dismissal on the basis of Rule 48(b) of the Federal Rules of Criminal Procedure. The district court, 557 F.Supp. 568, found a constitutional deprivation of the speedy trial guarantee and granted the motion to dismiss. Alternatively, the district court noted that in the event the delay had been found to be less than constitutional in dimension, it would have exercised its discretion and granted Litton's motion under Rule 48(b).[1] The United States appeals the order of dismissal and requests that the case be remanded for trial.

Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), is, of course, the controlling authority. There, the Supreme Court categorically rejected inflexible approaches and enunciated a balancing test, in which the conduct of both the prosecution and the defendant are weighed. Id. at 530–533, 92 S.Ct. at 2191–2193. The balancing test requires the con-

Joseph A. Fisher, III, James A. Metcalfe, Asst. U.S. Attys., Alexandria, Va., Sara Criscitelli, Appellate Section, Crim. Div., Dept. of Justice, Washington, D.C., for plaintiff-appellant.

* District Judge of the Western District of Louisiana, sitting by designation.

1. The Speedy Trial Act, 18 U.S.C. 3161, et seq., is applicable only to indictments filed on or after July 1, 1980 (18 U.S.C. 3163(c)); United States v. Horton, 646 F.2d 181 (5th Cir.1981). Nevertheless, Litton did agree on January 25, 1979 to waive its right to a speedy trial under the Act. This waiver occurred after the case was transferred to the Southern District of Mississippi, when the court declined to set a trial date because of Litton's argument that pre-trial motions might be dispositive and that it needed time to prepare for trial.

sideration of at least four factors: the length of the delay, the reason for the delay, the timeliness and strength of the defendant's assertion of his right, and the prejudice accruing to the defendant from the delay. No single factor is determinative; these "must be considered together with such other circumstances as may be relevant." 407 U.S. at 533, 92 S.Ct. at 2193.

After carefully considering all the facts, we conclude that, on balance, Litton's Sixth Amendment rights to a speedy trial[2] have not been violated, and that the "unsatisfactory severe remedy of dismissal" was not appropriate in the particular context of this complex case. 407 U.S. at 522, 92 S.Ct. at 2188.

## BACKGROUND

Various contentions are made in argumentative fashion in explanation of the extensive delay. We find little dispute as to the basic facts as reflected by the record.

(1) In 1968, the Ingalls Nuclear Shipbuilding Division of Litton Systems, Inc. ("Litton") contracted with the United States Navy for the construction of three nuclear submarines.

(2) Two years after the contract date, Litton filed a claim with the Navy seeking approximately 37 million dollars as a result of increased costs allegedly incurred by late delivery of government-furnished materials. The claim was brought before the Armed Services Board of Contract Appeals (ASBCA), which in April 1976 awarded Litton more than 16 million dollars.[3] This award was pegged on what the government now refers to as the false claim document, upon which the indictment is based.

(3) Litton filed a complaint in the United States Court of Claims seeking to recover the amount awarded. The United States counterclaimed for fraud.[3]

(4) January 17, 1977. Assistant Attorney General Richard Thornburg requested the United States Attorney to present the matter to a grand jury for the purpose of seeking an indictment. Attorney General Griffin Bell approved prosecution of the case on February 7, 1977.

(5) Litton expressed a desire to avoid prosecution and to return the matter to the Board along the lines of a proposal previously made by the government. The government attorney (Dunham) indicated that the prosecutors were now opposed to such a disposition but that he would forward any proposal from Litton to the Department of Justice for review. At Litton's request, the Attorney General, his principal assistants for matters pertaining to criminal prosecutions and fraud, and the United States Attorney and his assistants met with Litton's representatives. At the conclusion of this conference the Attorney General found no justification for terminating the prosecution. *United States v. Litton Systems, Inc.,* 573 F.2d 195–198 (4th Cir.1978).

(6) April 6, 1977. A federal grand jury in Alexandria, Virginia indicted Litton for filing a false claim in violation of 18 U.S.C. 287.

(7) April 11, 1977. Litton entered a plea of not guilty and filed a notice that the case was potentially complex. The court set May 20th for a hearing on pre-trial motions and set trial for June 6, 1977.

(8) May 2, 1977. Litton filed numerous motions, including one for a continuance of the trial date. In support of its motion defendant cited cases for the proposition that "myopic insistence upon expeditiousness" can render a defense ineffective, and that "concern with calendar dispatch" should not triumph over the right to a fair trial.

**2.** The Sixth Amendment reads in pertinent part:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed ..."

**3.** On February 3, 1978, the Court of Claims entered a stay pending final resolution of the criminal action.

(9) May 17, 1977. The United States filed a formal opposition to defendant's motion for a continuance.

(10) May 25, 1977 (10 days before the government was prepared to begin trial). The district court dismissed the indictment on the grounds of prosecutorial misconduct, concluding that the government had used the implied threat of an indictment in an effort to have Litton submit its claim to the ASBCA for reconsideration.

(11) April 4, 1978. The Fourth Circuit vacated the dismissal order. *United States v. Litton Systems, Inc.,* 573 F.2d 195.

(12) October 2, 1978. The Supreme Court denied Litton's petition for certiorari. 439 U.S. 828, 99 S.Ct. 101, 58 L.Ed.2d 121.

(13) November 28, 1978. The case was remanded to the United States District Court for the Eastern District of Virginia.

(14) December 1, 1978. Litton moved for a change of venue to the Southern District of Mississippi.

(15) December 4, 1978. The United States filed a motion for an order setting a trial date.

(16) December 8, 1978. Litton's motion for a change of venue was granted.

(17) December 20, 1978. The case was docketed in the Southern District of Mississippi. At that time the government was again prepared to go to trial.

(18) January 25, 1979. An untranscribed status conference was held at Jackson, Mississippi (Russell, J.). Mr. Frank W. Dunham, Jr., who was in 1978 the First Assistant United States Attorney for the Eastern District of Virginia, and who was later appointed a Special Assistant United States Attorney for the handling of this case, filed a detailed affidavit in the record. It reveals that at this conference, Litton objected to the government's request that a trial date be set. Litton also represented that it had employed new counsel (see March 7 letter from Brunini to Honorable Dan C. Russell, Jr.) and that it would take more than one year to properly prepare for trial.

(19) January 29, 1979. The district court entered three orders. One "ordered defendant to produce for the government within 60 days any document it intended to use at trial."[4] The second order, upon joint motion, found the case "as a whole, is so unusual and so complex due to the nature of the proceedings that it is unreasonable to expect adequate preparation within the periods of time established by ... the Speedy Trial Act ... and ... the ends of justice served by the entry of this Order outweigh the best interests of the public and the defendant in a speedy trial." Finally, the court entered an order specifying the manner in which motions and objections should be filed. This order noted that the parties were to file their motions within 40 days.

(20) March 7, 1979. Litton filed several motions, including one to dismiss upon statute of limitations and for alleged grand jury violations. It also requested a non-jury trial.

(21) March 19, 1979. The government filed objections to Litton's motions, arguing that with the exception of the motion for a non-jury trial, they restated previous motions denied in Virginia. These objections were filed directly with the district judge, together with a letter that closed: "We look forward to receiving further directions from the court as to a hearing date." No directions followed.

(22) December 19, 1979. The parties met and agreed that the prosecution would be stayed during settlement negotiations.

(23) January 23, 1980. Litton's attorney wrote to the United States Attorney confirming that negotiations were ended. The letter stated that "it is understood that the parties' agreement not to take any further action concerning the criminal case during the pendency of negotiations is terminated."

(24) January 13, 1982. Admiral Hyman Rickover wrote to Attorney General William French Smith:

---

**4.** To date, the government has not received a single defense exhibit. (Dunham affidavit).

"Over the past decade I have documented and reported to Defense Department officials numerous examples of false claims submitted by three major shipbuilders, Litton, General Dynamics, and Tenneco. The Navy, after reviewing these reports, forwarded them for investigation by the Justice Department. Today, after years of effort, it appears that the Justice Department is systematically closing down these investigations—either overtly or by inaction—even though the claims are demonstrably false and those who have investigated them have, I believe, recommended to their superiors that indictments be sought. In view of the Justice Department's poor record in this area, and its impact on Government procurement, I am bringing this matter to your attention with my recommendations for corrective action."

(25) February 14, 1982. U.S. Senator William Proxmire, having been alerted by Admiral Rickover's letter, also wrote a letter to the Attorney General requesting a status report on these cases and an explanation of why they had dragged on for so long, and why they are being dropped.[5]

(26) September 23, 1982. The United States filed a formal motion requesting a trial date. The court gave notice to counsel that this motion would be heard on November 4, 1982.

(27) October 29, 1982. Litton filed its motion to dismiss for prejudicial prosecutorial delay. The court noted its intention to hear this motion on December 6, 1982.

(28) November 4, 1982. At the prescheduled hearing, the United States again requested a trial date, arguing that a date was particularly necessary because Litton had raised a speedy trial claim for the first time. Litton argued that the court should defer setting a date for trial, but instead should set a date for a hearing on its motion to dismiss.

At this proceeding, Judge Russell was candid and forthright:

"As long as cases lie there dormant with the heavy schedule and heavy calendar of this court, we don't go around kicking them up. If the lawyers bring them to us, if the interested parties bring them to us, then we get them disposed of. And so, that may be part of the background in this case. If the urgency is there, it gets tried.

\*　　\*　　\*　　\*　　\*　　\*

"I'm sorry that it was not disposed of. The lack of hearing from either side, I assumed there was no rush in it."

Judge Russell did not set a trial date, but reset Litton's motion to dismiss for December 20, 1982.

(29) December 8, 1982. Judge Russell at his own suggestion entered a recusal order because of the possibility that he might be a material witness as to the validity of the motion to dismiss.

(30) December 27, 1982. A hearing of Litton's motion to dismiss was heard before Judge Adrian Duplantier in Biloxi, Mississippi.

(31) January 12, 1983. Judgment was rendered, dismissing the indictment.

(32) January 21, 1983. Notice of appeal was given by the United States.

To determine whether there has been a constitutional deprivation of the speedy trial guarantee, we return to the *Barker* balancing process. *See also, Jamerson v. Estelle,* 666 F.2d 241 (5th Cir.1982); *United States v. Greer,* 655 F.2d 51 (5th Cir.1981); *United States v. Hill,* 622 F.2d 900, 908 (5th Cir.1980); *Hill v. Wainwright,* 617 F.2d 375 (5th Cir.1980).

The first factor, the length of delay, serves two roles. First, it must be examined and found to be "presumptively prejudicial." *Barker v. Wingo,* 407 U.S. 514 at 530, 92 S.Ct. 2182 at 2192, 33 L.Ed.2d 101. Here, the parties agree that the delay was

---

5. The Rickover and Proxmire letters appear in Appellee's Record Excerpts. We cite them because of Litton's assertion, in both brief and oral argument, that "the government never would have pursued this indictment but for the political pressure generated by Admiral Rickover and Senator Proxmire."

presumptively prejudicial and serves as a "triggering mechanism" requiring further analysis. Secondly, we must weigh the length of the delay along with other factors we consider.

Because the period of delay suffices to trigger inquiry, we must address the presumptively prejudicial delay.[6] The Supreme Court said in *Barker v. Wingo:*

> Closely related to the length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than the defendant.

407 U.S. at 531, 92 S.Ct. at 2193, 33 L.Ed.2d at 117.

A chronological history of these proceedings has been recited. For the sake of clarity we reiterate in order to place the delay issue in proper perspective. The indictment was returned in April of 1977. The government requested and was granted a trial date of June 6, 1977. Litton requested a continuance. Ten days before the trial date, the district court granted the motion for dismissal. Ten months later the United States Court of Appeals for the Fourth Circuit vacated the dismissal order. Litton's petition for certiorari was denied and the case was reinstated in November of 1978. The Virginia district court granted Litton's motion to transfer to the Southern District of Mississippi. The Mississippi court called the case for a status conference on January 25, 1979. The government requested a trial date. Litton's new counsel represented that it would probably take at least a year to prepare for trial. Litton

filed a battery of motions. A schedule was established for submission of government objections. These objections were filed on March 19, 1979, together with a letter stating:

> "We look forward to receiving further directions from the court as to a hearing date."

In November of 1979, no hearing date having been requested or set, Litton's counsel requested that the parties explore the possibility of a package resolution of this case and the related civil case. On December 17, 1979, counsel met to discuss the proposal. It was agreed that neither side would make any move to alter the status quo of the criminal case. Settlement discussions terminated on January 23, 1980, without agreement. During 1980, Mr. Dunham, the government's lead counsel in this extremely complex litigation, was totally unavailable. Significantly, the government did not affirmatively ask for a continuance or do anything to protract the case. The government simply did not demand a trial date at a time when its uniquely qualified lead counsel was unavailable. Then, too, from December 1980 through March 1981, the government was giving serious consideration as to whether to proceed with this case. Because the original prosecution had been approved by Attorney General Bell, a reconsideration of that initial prosecutive determination by the new Attorney General and his staff appeared both reasonable and prudent. Mr. Dunham communicated his thoughts and conclusions to the Department of Justice in mid-March, 1981. He carefully analyzed the pros and cons of continuing with the case, not only from the standpoint of the government's interest, but also from the standpoint of fairness to Litton. The decision to proceed was made; the new United States Attorney in Virginia and her staff reviewed the case with the Assistant

---

**6.** We reiterate that the Speedy Trial Act is not applicable to this case. The excludability or non-excludability under its terms is largely irrelevant, since its standards differ substantially from the four-factor test established by the Supreme Court for determining whether a defendant's Sixth Amendment right to a speedy trial, as distinguished from statutory rights, has been violated.

Attorney General.[7] They decided to assemble a trial team (Dunham affidavit). The government filed a motion requesting a trial date. Five weeks later, and just three days before a scheduled hearing on the motion, Litton moved to dismiss the indictment and asserted its opposition to the setting of a trial date. At the prescheduled November 4, 1982 hearing, Judge Russell deferred setting a trial date. He recused himself because of the possibility that he might be a "material witness" on the issue of delay. Thereafter, Judge Duplantier was assigned to the case.

The two able and experienced trial judges who handled this case candidly and correctly placed the matter in precise perspective. Judge Duplantier noted during argument that "both sides were perfectly happy with the delay. That's what strikes me from the record, both sides, the Government and Litton." Judge Russell, before recusing himself, put it this way:

> "I want you all to know that we have the heaviest case load in the entire United States, myself, personally, with a thousand and fifteen cases ... we've had speedy trials down here, we've had a special grand jury that I impaneled for three solid years that has been bringing out indictments, white collar indictments. We've been rather busy in the Southern District of Mississippi.

> \* \* \* \* \* \*

> "As long as cases lie there dormant with the heavy schedule and heavy calendar of this court, we don't go around kicking them up. If the lawyers bring them to us, if the interested parties bring them to us, then we get them disposed of. And so, that may be part of the background in this case. If the urgency is there, it gets tried.

> \* \* \* \* \* \*

> "I'm sorry that it was not disposed of. The lack of hearing from either side, I assumed there was no rush in it."

There is nothing speedy about a five year delay, and such a delay triggers inquiry, but a review of the appendix and docketed record indicates that Litton rather than the government is responsible for most of the procedural delays in 1977, 1978 and 1979. It would be difficult to charge the prosecution with failure to try the defendant while Litton itself was engaged in seeking legal relief to prohibit such a trial. The government did not affirmatively ask for a continuance or do anything to protract this case. There is no evidence, not even a whisper, that the government deliberately attempted to delay the trial in order to hamper the defendant. Nevertheless, affirmative action in bringing cases to trial is mandated. The government cannot escape that duty on the basis that the delay is for institutional reasons. *Barker,* 407 U.S. at 531, 92 S.Ct. at 2192; *United States v. New Buffalo Amusement Corp.,* 600 F.2d 368, 377 (2nd Cir.1979). When negotiations were terminated in January of 1980, the government should have proceeded to press for an expeditious disposition of Litton's pending motions. Its failure to do so lends some support to defendant's Sixth Amendment claim.

Two counterbalancing factors outweigh this government complacency. Prejudice, if any, is minimal. Prejudice, under the Supreme Court's analysis, embraces three areas of protected interests: oppressive pre-trial incarceration, anxiety and public opprobrium of the accused *and* impairment of the defense. 407 U.S. at 532, 92 S.Ct. at 2193. The first two of these primary interests do not apply to a corporate defendant. The final factor—prejudice to one's defense—is difficult to evaluate qualitatively and quantitatively. It is speculative at best. *United States v. MacDonald,* 435 U.S. 850, 858, 98 S.Ct. 1547, 1551, 56 L.Ed.2d 18 (1978). Litton argues that several key witnesses have died and documents vital to the defense have been lost. The district judge noted the conclu-

---

**7.** The care obviously given the matter by the Justice Department [during this period] is certainly not any indication of bad faith or deliber-

ate delay. See *U.S. v. MacDonald,* 456 U.S. 1, 102 S.Ct. 1497, 1503, fn. 12, 71 L.Ed.2d 696 (1982).

sion that compelling Litton to stand trial without these lost documents is not as clearly prejudicial as is the absence of the deceased witness, Adams.

The government has supplied to Litton copies of all grand jury testimony and intended trial exhibits. Only one of the boxes destroyed by the Navy in 1977 contained material arguably relevant to this case. Its routine destruction before the indictment was returned does not bear on the speedy trial claim. The remaining four boxes of documents currently missing were made available to Litton in 1977, prior to the original trial date of June 1977. They were merely copies of materials furnished the government by Litton.

Only one of the alleged unavailable witnesses was alive in January of 1980. This was David Adams, whose absence the district court found to be substantially prejudicial. Adams had worked for Litton in 1972 and had prepared the manpower charts which Litton filed with the Department of Defense. He was a key government witness before the grand jury, although he was not called by either the government or Litton to testify at the ABSCA proceeding. But, even if Adams could have been available to give exculpatory testimony at Litton's criminal trial, his extensive grand jury testimony, strongly probative of corporate intent, would have been extremely effective impeachment.

The Supreme Court has recognized,

> [B]efore trial, of course, an estimate of the degree to which delay has impaired an adequate defense tends to be speculative."

*United States v. MacDonald I,* 435 U.S. 850, 858, 98 S.Ct. 1547, 1551, 56 L.Ed.2d 18 (1978). The record in this case simply does not support a finding that defendant suffered prejudice as a result of the delay.

■ More important than the absence of prejudice is that Litton definitely did not want to be tried. *Barker* rejected the absolute rule that a defendant who fails to demand a speedy trial forever waives his Sixth Amendment right, but made it abundantly clear that the defendant's assertion

of his desire to be tried promptly is to be considered in deciding whether his right has been denied:

> The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.

407 U.S. at 531–532, 92 S.Ct. at 2192–2193.

From the inception of this litigation, Litton has sought delay. In effect, it now complains that it did not receive what it never wanted. The district court found that a letter written by Litton's attorney to the United States Attorney's office on January 23, 1980 suffices to constitute an assertion of a Sixth Amendment speedy trial right. Contrary to the district court's assumption, the letter merely recorded the termination of the settlement discussions that had been requested by Litton's counsel in November of 1979. The statement in the letter—"the parties' agreement not to take any further actions concerning the criminal case during the pendency of the settlement negotiations is terminated"—does not by any stretch of the imagination constitute an assertion of a speedy trial demand or claim, let alone a request. Such a reading lacks reality and in our view is clearly erroneous.

The truth is that Litton did not seek a trial date; Litton made an intelligent, counseled speedy trial waiver. The government never requested a continuance or deliberately delayed the prosecution. To the contrary, the government was prepared to prosecute the case in the Eastern District of Virginia in June 1977, and again when the indictment was reinstated in November 1978, and yet again after the case was removed to Mississippi. Litton opposed prompt trials on each occasion and repeatedly expressed a need for lengthy continuances to prepare for trial. Indeed, it continued in November 1982 to oppose the setting of a trial date.

■ Our review of constitutional considerations pursuant to *Barker* criteria convinces us that Litton was not denied a Sixth Amendment speedy trial. Remarkably applicable here is the Supreme Court's closing paragraph:

We do not hold that there may never be a situation in which an indictment may be dismissed on speedy trial grounds where the defendant has failed to object to continuances. There may be a situation in which the defendant was represented by incompetent counsel, was severely prejudiced, or even cases in which the continuances were granted *ex parte*. But barring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial. We hold, therefore, that Barker was not deprived of his due process right to a speedy trial.

407 U.S. at 536, 92 S.Ct. at 2195. There are no such "extraordinary circumstances" in this case, and to so hold would be a distortion and abuse of the right to a speedy trial under the Sixth Amendment, which was never intended to protect those who do everything in their power to delay or defeat the holding of a trial as long as possible.

The district court, on a separate and alternative basis, dismissed the indictment pursuant to Rule 48(b) of the Federal Rules of Criminal Procedure.[8]

The record demonstrates that the government never requested a continuance or deliberately delayed the prosecution. There is no serious suggestion of prosecutorial bad faith. The delays occasioned by Litton's various legal initiatives in 1977, 1978 and 1979 cannot be attributed to the prosecution. There was no constitutional deprivation, and peremptory dismissal without forewarning, followed by a long period of acquiescence in the delay, was not appropriate.

---

8. This rule is not confined to constitutional violations, but also embraces the inherent power to dismiss for want of prosecution. *United States v. Novelli,* 544 F.2d 800, 803 (5th Cir. 1977). The rule provides in pertinent part:

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

"If there is unnecessary delay ... in bringing a defendant to trial, the court may dismiss the indictment, information or complaint."